UNITED STATES OF AMERICA

VS.                                                          CASE NO: 2:13-cr-9-FtM

CHETSADA SRISANTHIA

_____

## <u>ORDER</u>

This matter comes before the Court on Defendant Chetsada Srisanthia's Motion to Suppress Evidence and Statements (Doc. #21) filed on April 4, 2013.  The Government filed its Response to Defendant's Motion to Suppress Statements (Doc. #22) on April 18, 2013.  The Court held a hearing on the instant Motion on May 29, 2013, during which time the Court heard testimony on the Motion and argument from counsel for both parties.  The Defendant was present with an interpreter and represented by Assistant Federal Public Defender, Russell K. Rosenthal.  The Government was represented by Assistant United States Attorney, Yolande G. Viacava.

At the hearing, the Government called five (5) witnesses:  Cassaundra Holden, Detective Maalisa Langton of the Fort Myers Police Department, Khamza Koedri, Kristo Kristidhi of the United States Citizenship and Immigration Service, and Special Agent James Stone of Homeland Security.  The Government also introduced eight (8) exhibits: a Consent to Search form signed by Defendant (Govt. Ex. 1), the State search warrant affidavit and search warrant obtained for Defendant's residence (Govt. Ex. 2), pictures taken of Defendant's residence during the execution of the search warrant (Govt. Ex. 3), the <u>Miranda</u> rights form read to Defendant (Govt. Ex. 4), an audio recording of the Defendant's statement to Detective Langton on October 21, 2012, taken at the Fort

Myers Police Department (Govt. Ex. 5), the filtered search history from Defendant's computer (Govt. Ex. 6), Defendant's Petition for Alien Relative stamped approved on June 7, 2011 (Govt. Ex. 7), and a transcript of Defendant's recorded statement to Detective Langton on October 21, 2012 (Govt. Ex. 8). The Defense called six (6) witnesses: attorney Mark Ringsmuth, Sandra Srisanthia, Somsaint ("Sam") Phanthavong, Siriporn ("Sara") Strike, Paul Wakefield, and Victoria Russell. The Defense also introduced two (2) exhibits: a Pretrial Services form (Def. Ex. D), and a rental application (Def. Ex. E).

## BACKGROUND

Defendant is a citizen of Thailand who entered the United States on November 27, 2009, with a J-1 visa to participate in a work-based exchange visitor program through 7-Eleven. On June 7, 2011, he adjusted his status to that of a Lawful Permanent Resident.

In the late hours of October 20, 2012, a female placed a call to the Fort Myers Police Department to report observing child pornography on Defendant Chetsada Srisanthia's computer while she was staying at his apartment. Fort Myers Police Officers met with the complainant and another female in a business parking lot. The women informed the Officers that they were temporarily staying at Defendant's residence and that Defendant allowed them to use his computer while he was at work. The women described four (4) videos depicting child pornography that they discovered while on Defendant's computer.

Defendant was located by the police at his workplace, a 7-Eleven store in Fort Myers. There, the Government alleges that Defendant gave verbal consent to show the

police the videos on his computer. The Defendant did not have access to a vehicle, so the police took him to his residence, located at 4735 DeLeon Street, Unit 123 C, Fort Myers, Florida, approximately one block from the 7-Eleven. Once outside the residence, Defendant signed a Fort Myers Police Department Voluntary Consent to Search form. He then let the officers into his apartment and showed them a video depicting a prepubescent girl dancing provocatively in see-through lingerie surrounded by adult men. Based on these observations, Detective Langton detained the Defendant and obtained a search warrant for Defendant's residence and computer, which resulted in the seizure of a Samsung laptop and an external hard drive.

Defendant was then taken to the Fort Myers Police Department in the early morning hours of October 21, 2012. In a tape recorded interview, Detective Langton sought to read Defendant his <u>Miranda</u> rights and obtain a waiver thereof. This proved difficult, as Defendant's first language is Thai. Thereafter, Defendant made statements that he downloaded underage pornography for his friends in Thailand and intended to take a hard drive containing the images and videos to Thailand so that his friends could view them. No interpreter was present during any of the events on October 20 and 21, 2012, and all communications between police and Defendant were made in English.

On January 23, 2013, the Grand Jury returned a one-count indictment against Defendant Chetsada Srisanthia. Defendant is charged with knowingly possessing one or more matter(s) which contain a visual depiction that had been transported in interstate and foreign commerce, and which had been produced using materials which had been transported, by any means including by computer, where the production of

such visual depiction involved the use of a minor engaging in sexually explicit conduct, and such visual depiction is of such conduct.  (Indictment, Doc. #1).

## I. TESTIMONY AND EVIDENCE PRESENTED BY THE GOVERNMENT

*Cassaundra Holden*

Cassaundra Holden ("Holden") testified that she has known the Defendant for approximately three years and they have been friends for approximately a year.  She met the Defendant at the 7-Eleven where he was employed. For the duration of their relationship Holden and the Defendant only communicated in English.  They exchanged approximately one hundred (100) to one hundred-fifty (150) text messages in English over the course of a year.   There is no evidence of those text messages because Holden's phone was damaged.

On October 19, 2012, Holden and another friend, Samantha Fraser ("Fraser"), stayed at the Defendant's house.  On October 20, 2012, the Defendant gave Holden a house key and permission to go to his house so that she and Fraser could use his shower and hang out there while he was at work.  While at his house, Holden and Fraser accessed the Defendant's computer to watch a movie as they had done with the Defendant the night before.  While looking for a movie to watch on the Defendant's computer, Holden observed dozens of files which contained child pornography.

After observing the files, Holden and Fraser left the Defendant's house and returned his house key to him at 7-Eleven.  They then went home and called the police. Holden met the police at Walgreens and told them what she had observed.

*Detective Maalisa Langton*

Detective Maalisa Langton ("Detective Langton") has been a detective with the Fort Myers Police Department since 2003. She testified that while working on October 20, 2012, she was dispatched to respond to Walgreen's to meet with two (2) females who had observed child pornography on a friend's computer. Detective Langton testified that she met with the women, who stated that they were spending the night at a friend's apartment, known to them as "Joey." The women told Detective Langton that while trying to access a movie on "Joey's" computer when he was working at 7-Eleven, they discovered several images and videos of child pornography.

After taking statements from the two women, Detective Langton and Sergeant Freeman went to 7-Eleven to make contact with "Joey." Detective Langton stated that she and Sergeant Freeman observed the Defendant ("Joey") working behind the counter and interacting with customers in English. Detective Langton identified herself and told the Defendant that she had spoken with his friends, who were concerned about images that they saw on his computer. She testified that she asked the Defendant if he was willing to show her the images and videos on his computer and the Defendant said yes. The Defendant then told his supervisor that he was leaving. He did not have a vehicle, so the officers offered the Defendant a ride to his apartment in one of their cars. Detective Langton stated that the Defendant rode in the back of Sergeant Freeman's car, but she could not remember whether it was a marked or unmarked car. Detective Langton was in plain clothes with her badge and gun and Sergeant Freeman was wearing full uniform. She testified that the Defendant was not placed under arrest,

handcuffed, or searched. The Defendant's apartment was approximately one block away from the 7-Eleven store.

Once outside the Defendant's apartment, Detective Langton read a Fort Myers Police Department Voluntary Consent to Search form to the Defendant, containing eight (8) statements. (Govt. Ex. 1). Detective Langton testified that the Defendant agreed to give the officers consent to enter his apartment, after which he signed the form. (Govt. Ex. 1). She stated on cross examination that the Defendant appeared to understand and did not ask any detailed questions about the statements on the form.

After signing the form, the Defendant told Detective Langton that he had underage pornography on his computer. On cross examination, Detective Langton stated that although she first used the phrase "child pornography," she did not have to explain its meaning to the Defendant. She could not remember with certainty, but testified that she believed it was the Defendant who first used the term "underage" in reference to the pornography on his computer.

After making that statement, the Defendant opened the front door of his apartment and led the officers to his computer. The Defendant produced a video on his computer, which the officers observed. Detective Langton testified that the video depicted a prepubescent female dancing provocatively and wearing see-through lingerie. Detective Langton stated that she stopped the Defendant, walked out of the apartment, and secured it pending a search warrant. On October 21, 2012, the search warrant for the Defendant's residence was obtained and executed Detective Langton testified that Defendant's laptop, several external hard drives, and a phone were seized. (Govt. Ex. 3a-3e composite).

After the apartment was secured, the Defendant was detained and taken to the Fort Myers Police Department. There, Detective Langton obtained a tape-recorded statement from the Defendant. (Govt. Ex. 5, Govt. Ex. 8). Although on cross examination Detective Langton testified that the Defendant spoke broken English, at no time during the interview was an interpreter present. During the interview, Detective Langton used a Fort Myers Police Department form to collect information about the Defendant and to read his <u>Miranda</u> rights and obtain a <u>Miranda</u> waiver. (Govt. Ex. 4). She stated that the Defendant was able to see the form, was reading along with her, and that he asked some questions about a couple of words that he pointed to on the form.

At the beginning of the tape-recorded interview, the Defendant asked Detective Langton what would happen if she asked him something and he only understood "like half or something like that?" (Govt. Ex. 8, p. 1). She stated that in that case, she would explain the concept the best way she could. (<u>Id.</u> at 2). The Defendant told Detective Langton that his first language is Thai and said, "It's good I talk English little bit too." (<u>Id.</u> at 6, 7). The Defendant struggled to answer questions about his date of birth and race while Detective Langton filled out the bottom of the form. (<u>Id.</u> at 2, 3). On cross examination, Detective Langton admitted that throughout the interview the Defendant had difficulty understanding particular words, and in some cases, entire sentences.

Detective Langton proceeded to read the <u>Miranda</u> rights and <u>Miranda</u> rights waiver form (Govt. Ex. 4) to the Defendant. She told the Defendant that the conversation was "Just between you and me." (Govt. Ex. 8, p. 13). On cross examination, she testified that she meant the conversation was between her and the

Defendant, not that what he said could not be used against him in court. When Detective Langton told the Defendant that he had the right to remain silent, he asked her what the word "silent" meant, to which Detective Langton responded, "Meaning you don't have to talk to me at all if you don't want to." (Id. at 7). He then asked her if it was better that he talk to her. (Id. at 8). After telling the Defendant that she could not tell him what to do, Detective Langton informed him that anything he said could be used against him in court, to which the Defendant responded, "Yeah! I heard from … from movie. This one I know." (Id.). Believing he understood, Detective Langton then told the Defendant he had the right to talk to a lawyer during questioning. (Id.). The Defendant asked what "during" meant, to which Detective Langton replied, "Like while I'm talk [sic] to you, you have the right to request a lawyer." (Id.). Detective Langton then told the Defendant that if he could not afford a lawyer, one would be appointed for him. (Id.). The Defendant responded, "If I don't have … okay, you can find some for me?" (Id.). After responding affirmatively, Detective Langton told the Defendant, "If you wish to answer questions now, without a lawyer present, you will still have the right to stop answering at any time." (Id. at 9). The Defendant said, "I don't understand. Okay! That's … that's why you bring me over here for talking." (Id.). Detective Langton responded "Yes … but these are your rights." (Id.).

Detective Langton then told the Defendant that she wanted to talk to him about the child pornography on his computer. (Id. at 10). She testified that at that point, the Defendant had not waived his Miranda rights. After informing the Defendant that he was detained and not free to leave, she read the Miranda waiver on the Fort Myers Police Department form. (Govt. Ex. 4). The Defendant responded, "The first one I

understand," (Govt. Ex. 8, p. 11), and proceeded to say that he did not want a lawyer. (Id. at 12).  He later asked Detective Langton what the word "promise" meant, to which she replied, "No promises means I'm not promising you anything.  I'm not saying to you, 'If you talk to me right now I'll buy you a hamburger.'" (Id.).  The Defendant later asked what "pressure" meant and Detective Langton told him that she was not forcing him to talk to her.  (Id. at 13).

Detective Langton then asked the Defendant if he still wanted to talk to her, knowing all of this, and the Defendant replied, "Yeah!  I … I want to know something for … because I have to plan my life now."  (Id. at 14).  Detective Langton testified that she believed the Defendant had waived his Miranda rights at this point.  She did not request that he sign the waiver form, stating that a signature was not legally required, even there was a place for a signature on the form.  On cross examination, Detective Langton said that she did not forget to ask the Defendant to sign the form, but instead made the choice not to request the Defendant's signature.

After having read the waiver, Detective Langton reminded the Defendant that he had already spoken to her at the 7-Eleven store about the child pornography on his computer.  (Govt. Ex. 8, p. 14).  The Defendant then proceeded to answer questions about the "underage pornography" on his computer, including how he downloaded it and that he was planning to bring it to Thailand for his friends.  (Id. at 16-36).  When Detective Langton asked what website he had used to download the images and videos, the Defendant wrote the website on the bottom of the Miranda waiver form.  (Id. at 32-33, Govt. Ex. 4).

*Khamza Koedri*

Khamza Koedri ("Koedri") has been employed at the 7-Eleven store in Fort Myers for two and a half years and was trained by the Defendant. He speaks Uzbek and Russian as well as some English. Koedri stated that he and the Defendant communicated in English at all times. He also testified that he observed the Defendant communicating in English with customers and with Sandy, the Defendant's wife. Finally, Koedri testified that to work at 7-Eleven, employees only have to speak a little bit of English.[1]

*Kristo Kristidhi*

Between 2003 and 2007, Kristo Kristidhi ("Kristidhi") was employed by the Immigration and Naturalization Service. Since 2007, he has worked as a Senior Immigration Officer for the United States Citizenship and Immigration Service. His duties include adjudicating petitions and applications filed by foreign nationals seeking immigration benefits in the United States.

On June 7, 2011, Kristidhi adjudicated and approved a Petition for Alien Relative filed by a United States citizen, Sandra Srisanthia, on behalf of her husband, the Defendant. (Govt. Ex. 7 composite). The purpose of the interview was to ensure that the marriage between the Defendant and Sandra Srisanthia was legitimate. Kristidhi testified that although he had no recollection of the interview with the Defendant and Sandra Srisanthia, it would have been conducted in English. He stated that if they had

---

[1] The Court notes that although Koedri indicated he spoke English when speaking with the Defendant, it was clear from the testimony that he spoke broken English and sometimes had difficulty answering questions asked of him by the Government.

any difficulty speaking English, the normal office procedure would be to file an interpreter's form, which he observed is not attached to the Petition.

Kristidhi also testified that according to the Petition for Alien Relative, the Defendant entered the United States on a J-1 visa. One of the requirements for a J-1 visa is that the applicant must have "sufficient knowledge" of the English language. The Defendant's application also included an I-485 form signed by the Defendant with a box checked next to the statement: "I can read and understand English, and I have read and understand each and every question and instruction on this form, as well as my answer to each question." (Govt. Ex. 7 composite). The other option, remaining unchecked, states: "Each and every question and instruction on this form, as well as my answer to each question, has been read to me in the _____ language, a language in which I am fluent, by the person named in Interpreter's Statement and Signature. I understand each and every question and instruction on this form, as well as my answer to each question." Kristidhi testified that the presence of the J-1 visa, coupled with the checked statement on the I-485 form, led him to believe that the Defendant had sufficient knowledge of the English language, but he does not specifically remember the interview he conducted with Defendant and his wife.

### _Special Agent James Stone_

James Stone ("Special Agent Stone") has worked as a Special Agent for Homeland Security Investigations since 1998. For the last two (2) years, he has worked as a computer forensics agent. His training included a six (6) week course, involving A+ certification, basic security certification, and training on necessary software. He has also been trained in mobile device forensics.

Special Agent Stone conducted a forensic analysis of Defendant's computer and hard drive that was connected to Defendant's Samsung laptop that was seized pursuant to the search warrant, finding several files containing images and videos depicting child pornography. He also conducted a review of the internet search history on the Defendant's laptop, filtering the results to look for searches that would elicit child pornography. Using the filtered search history (Govt. Ex. 6), Special Agent Jones testified that he could identify the search terms typed by the Defendant. He indicated that all of those terms were in the English language.

## II. TESTIMONY AND EVIDENCE PRESENTED BY THE DEFENSE

### Mark Ringsmuth

Mark Ringsmuth ("Ringsmuth") is an attorney, licensed in 1999, with ten and one half years of criminal defense experience. Defendant Chetsada Srisanthia retained Ringsmuth in November 2012, to represent him in a case (12-cr-18713) in Circuit Court in Lee County (the "State case"), based on the same factual charges as the instant case. Ringsmuth testified that at the end of October 2012, the Defendant's friend, "Sam," called Ringsmuth to set an appointment with him. The next day, the Defendant and Sam visited Ringsmuth's office, where they filled out a New Client Information Sheet, requiring personal and contact information. Ringsmuth testified that the Defendant filled out part of the form, and Sam completed the remainder, inserting information including the Defendant's name, the number of his street address, and contact information including Sam's name and telephone number.

Ringsmuth testified that he then conducted an interview, where he was able to speak with the Defendant to a limited extent, but the Defendant did not have a strong

grasp of the English language. He testified that Sam spoke fluent English and Thai. Ringsmuth also testified that he attempted to discuss the Defendant's rights with him, but that the Defendant did not understand, so Ringsmuth began to talk to Sam, who translated the concepts to the Defendant in Thai. If the Defendant still did not understand, Ringsmuth testified that he further broke down and explained those concepts and Sam translated them for the Defendant. Ringsmuth testified that Sam also acted as a translator between he and the Defendant when negotiating Ringsmuth's fee. He also testified that the Defendant did not understand the potential penalties he faced or how the court system functioned, so Ringsmuth once again used Sam as a translator to tender explanations. At the Case Management Conference in the State case, Ringsmuth again used Sam as a translator to explain what would happen and the roles of both attorney and defendant.

After an interview with a Pretrial Services representative on October 21, 2012, the Defendant signed a certified Lee County Circuit Court document. (Def. Ex. D). On this form, a checkmark was placed next to the statement "I cannot read English but this disclosure form was read to me by: _____ in _____ (language) which I understand."[2] (Id.). Based on his observations and the checked statement on the Pretrial Services form, Ringsmuth testified that he would not have discussed a plea offer, potential motions or defenses, or reviewed discovery with the Defendant without an interpreter present. Ringsmuth also stated that he would not have allowed the Defendant to proceed to trial or enter a plea without an interpreter. He testified that the Defendant did not seem to understand the most basic conversations in English and he did not feel

---

[2] Neither the name of an interpreter nor a language was provided.

comfortable letting the Defendant do anything without an interpreter.  Ringsmuth also testified that listening to the Defendant's tape recorded statement (Govt. Ex. 5) reinforced his opinion that the Defendant was unable to understand anything complex in English.

### *Sandra Srisanthia*

Sandra Srisanthia ("Mrs. Srisanthia") is the Defendant's wife.  They were married in July 2010, and have been separated since May 2012, but have maintained contact.  She was also the manager of the 7-Eleven store where the Defendant worked.

Mrs. Srisanthia testified that she and the Defendant communicated in English, but that she often had to slow her speech and repeat things in different ways so that the Defendant could understand her.  She stated that sometimes the Defendant would indicate that he understood something when in fact he did not.  Occasionally, she used Google Translate to translate phrases from English to Thai.  Mrs. Srisanthia also testified that although the Defendant could communicate with customers at 7-Eleven regarding their needs, he could only pretend to carry on a substantive conversation.

Mrs. Srisanthia stated that because the Defendant could only understand the basics of a conversation in English, she completed any and all paperwork for the Defendant and told him where to sign.  She did this for both the Petition for Alien Relative (Govt. Ex. 7 composite) and the Defendant's rental application (Def. Ex. E).  In regard to the I-485 form in the Petition, Mrs. Srisanthia testified that she checked the box stating the Defendant could read and understand English because the only other option was the statement indicating that an interpreter was used.  She stated that because they did not use an interpreter, that selection was inappropriate.  Additionally,

Mrs. Srisanthia testified that in their interview with Kristidhi regarding the Petition, the Defendant looked to Mrs. Srisanthia every time Kristidhi asked him a question. He did not know what to say and was confused by such questions as whether he had ever lied to the United States government. Mrs. Srisanthia remembered that Kristidhi became frustrated during the interview because the Defendant did not understand what he was saying in English.

*Somsaint ("Sam") Phanthavong*

Somsaint Phanthavong ("Phanthavong") is a hibachi chef who was born in Thailand. Phanthavong speaks fluent English and Thai. He has lived in the United States for twenty-three (23) years, the last fifteen (15) of which have been spent in southwest Florida. Phanthavong met the Defendant at 7-Eleven approximately one (1) year before the Defendant's arrest.

Phanthavong testified that most of his communication with the Defendant was in Thai and that the Defendant was not fluent in English. He stated that he helped explain things to the Defendant and often translated for him. Phanthavong also acted as an interpreter between the Defendant and attorney Mark Ringsmuth after the Defendant's arrest.

When speaking to the Defendant in English, Phanthavong testified that he had to repeat things three (3) or four (4) times and often the Defendant would indicate that he understood when he did not. For this reason, when discussing important matters with the Defendant, Phanthavong stated that he always spoke in Thai.

*Siriporn ("Sara") Strike*

Siriporn Strike ("Strike") was born in Thailand and moved to the United States thirty-five (35) years ago. She is the owner of the Chinese restaurant where the Defendant worked as a cook. All of her communication with the Defendant was in Thai. Strike testified that although the Defendant greeted some customers in English, he was unable to work as a waiter in the restaurant because his English was not good enough.

*Paul Wakefield*

Paul Wakefield ("Wakefield") served in the military for fifteen (15) years. He now owns a restaurant and consults in homeland security and biometrics. Wakefield testified that he has known the Defendant for a few months and has spoken with the Defendant for a total of one (1) or two (2) hours over that period. They met at a Thai restaurant where the Defendant worked. Wakefield testified that the Defendant usually worked in the kitchen, where English was typically not used. When English was spoken, Wakefield noted that things had to be repeated for the Defendant, who often still did not understand, though he pretended to. Wakefield was impressed with the Defendant's ability to deal with people despite his poor grasp of English.

*Victoria Russell*

Victoria Russell ("Russell") knows the Defendant through her fiancée, Sam Phanthavong. She only speaks English, so all of her communications with the Defendant were in English. Russell testified that when speaking to the Defendant, she often had to rephrase her statements. She stated that although the Defendant pretends to understand what was said in English, his responses often indicate that he does not really understand.

**DISCUSSION**

Defendant moves to suppress the following items of evidence and statements:

(1) All statements alleged to have been made by Defendant to officers at his residence at 4735 DeLeon Street, Unit 123 C, Fort Myers, Florida. It is undisputed that these statements were non-Mirandized.

(2) Contents of the search conducted by law enforcement at Defendant's apartment, 4735 DeLeon Street, Unit 123 C, Fort Myers, Florida, including any testimony as to observations made inside the residence and any material observed on the computer at this residence.

(3) Defendant's taped statement provided to Detective Langton. Defendant maintains that this statement was not the product of a valid waiver of his Miranda rights.

The Court will consider each issue in turn.

*Pre-Miranda Statements*

There is no dispute that Srisanthia was not read Miranda rights either at his place of employment or at his residence prior to making incriminating statements to law enforcement. Defendant argues that these were custodial statements and, therefore, cannot be used against him.[3]

---

[3] The only initial statement discussed at the motion to suppress hearing was a purported statement by the Defendant after he signed the consent to search form at his apartment that he had "underage pornography" on his computer. There was some confusion in the testimony as to whether the Defendant first suggested the phrase "underage pornography" or Detective Langton did.

A person need only be informed of his <u>Miranda</u> rights if he is in custody and is being interrogated. <u>Miranda v. Arizona</u>, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Under <u>Miranda</u>, custody is the depravation of freedom of action normally associated with an arrest. <u>Id.</u> at 444. The Supreme Court defined interrogation as "express questioning or words and actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01, 110 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). Purely voluntary statements made by a defendant are not barred by <u>Miranda</u>. 384 U.S. at 478.

The initial determination of custody depends on the objective circumstances of interrogation and not on the subjective views harbored by either the officer or the defendant. <u>Stansbury v. California</u>, 511 U.S. 318, 323, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) (per curiam). <u>See also</u> <u>United States v. Moya</u>, 74 F.3d 1117, 1119 (11th Cir. 1996) ("The test is objective: the actual subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."). "Custody for purposes of <u>Miranda</u> encompasses not only formal arrest, but any restraint on freedom of movement of the degree associated with formal arrest." <u>Dexter v. Secretary, Dept. of Corrections</u>, 2008 WL 1956029 *8 (M.D. Fla. May 2, 2008). In determining whether a person is in custody, the Court notes that "[a] person is in custody if a reasonable person placed in the same position would believe that his or her freedom of actions was curtailed to a degree associated with actual arrest." <u>Id.</u> Where a reasonable person "would feel free to decline the officers' requests or otherwise terminate the encounter," the encounter with the police is consensual, and the Fourth

Amendment is not implicated.  United States v. Ramirez, 476 F.3d 1231, 1237 (11th Cir. 2007) (citing Florida v. Bostick, 501 U.S. 429, 436, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)).  "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody[.]"  Miranda, 384 U.S. at 443.

In this case, the Court finds that Defendant was not in custody.  Defendant was not physically restrained and Detective Langton testified that she allowed the Defendant to go tell his supervisor at 7-Eleven that he was leaving.  He was given a ride to his apartment approximately one block away as he did not have a vehicle.  Defendant was not handcuffed or searched.  Defendant was advised that he was not being detained and was free to revoke his consent at any time.  See Govt. Ex. 2, p. 2.  Detective Langton testified that she asked Defendant if he was willing to show her the images and videos on his computer to which the Defendant responded yes.  Detective Langton testified that while she was speaking to him at the 7-Eleven, he did not appear to have any difficulty understanding what she was telling him.  Defendant willingly went with law enforcement to his apartment where he signed the consent to search form after which he made a statement that he had "underage pornography" on his computer.

In a similar case recently decided by the Eleventh Circuit, a defendant stated that he had "underage pornography" after agents confronted him about the contraband.  In that case, the court noted that "from the record, it appears that Manta-Carillo's statement was not in response to any question that Anderson posed and, therefore, Miranda would be inapplicable, even assuming Manta-Carillo was in custody for Fifth Amendment purposes at that point."  United States v. Manta-Carillo, 491 F. App'x 125, 128-29 (11th Cir. 2012).

This case did not involve circumstances where there was a restraint on freedom of movement of the degree associated with formal arrest.  Further, there is no indication in the record that Defendant's statement that he had "underage pornography" on his computer was in response to any question posed by law enforcement.  Thus, the Motion to Suppress any initial statements made by the Defendant prior to the taped statements is denied.

## *Apartment Search*

Defendant next moves to suppress evidence seized in violation of the Fourth Amendment as a result of a warrantless and consentless search of his residence during the early morning hours of October 21, 2012, and that the evidence seized be subject to suppression.  Defendant argues that the search of Defendant's residence at 4735 DeLeon Street, Unit 123 C, Fort Myers, Florida after he signed the consent to search form violated the Fourth Amendment because Defendant did not provide valid consent for the search.  Even though Defendant signed the consent to search form at 12:36 a.m. on October 21, 2012 (Govt. Ex. 1), Defendant maintains that he has insufficient knowledge of the English language for the consent to search to be deemed voluntary.

It is well settled that under the Fourth Amendment, a search conducted without a warrant issued upon probable cause is "'*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"  United States v. Rivero, 2008 WL 4833093 * 6 (M.D. Fla. Nov. 5, 2008) (citing Schneckloth v. Bustamonte, 12 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed 2d 854 (1973) (citations omitted).  One established exception to the requirements of both a warrant and probable cause is that the search is conducted pursuant to consent. Id. (citations omitted); United States v. Brown, 243 F.

App'x 544, 549 (11th Cir. 2007). A consent to search must be the product of an essentially free and unconstrained choice. Rivero, 2008 WL 4833093 * 6 (citing United States v. Zapata, 180 F. 3d 1237, 1241 (11th Cir. 1999) (quoting United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989)). "The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." Illinois v. Rodriquez, 497 U.S 177, 181, 110 S. Ct. 2793 (1990).

The Court must consider the totality of the circumstances to determine if the consent was voluntary. United States v. Drayton, 536 U.S. 194, 207, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002), Schneckloth, 12 U.S. at 226. In considering the totality of the circumstances, the Court must examine several factors including any coercive police procedures, the defendant's cooperation with officers, the defendant's knowledge of her right to refuse to consent, the defendant's education and intelligence, and the defendant's belief that there is no incriminating evidence to be found. Brown, 2007 WL 2688662 at * 5. The burden is on the Government to show that the consent was freely and voluntarily given. Rivero, 2008 WL 4833093, *6 (citing United States v. Tovar-Rico, 61 F.3d 1529, 1536 (11th Cir. 1995). "In determining whether an individual has sufficient comprehension of English to provide voluntary consent, courts examine his ability to interact intelligently with the police." Zapata, 180 F.3d at 1242. This includes an examination of whether the defendant gave appropriate responses to the officers' questions. Id. In Zapata, the Defendant twice gave officers consent to search his minivan and the Eleventh Circuit found that [t]here [was] no evidence that [defendant] was confused by, or did not understand, any of Phillips's questions." Id. Further, with

regard to consent, the Eleventh Circuit stated in <u>United States v. Rios</u> that "[w]hether Rios stated that the officers could 'search' his room or that they could 'check' his room, a reasonable police officer would have believed that Rios was allowing him to search for narcotics. . . ." 443 F. App'x 433, 438 (11th Cir. 2011).

Defendant does not contend that Srisanthia's age, education, or intelligence mitigated his ability to voluntarily consent to the search. There is no evidence that Srisanthia was physically forced in any way to consent or was threatened if he did not do so. Rather, Defendant argues that his limited understanding of the English language shows that his consent was involuntary. The Government responds that Defendant speaks English and thus understood that he was consenting to a search of his apartment. Therefore, the Court will consider the issue of whether the Defendant was able to understand the process due to language issues.

In this case, Defendant was located by law enforcement at his workplace, a 7-Eleven store in Fort Myers, after Holden and Fraser called police to inform them that they found videos of child pornography on Defendant's computer. Detective Langton testified that she asked Defendant if he was willing to show her the images and videos on his computer to which the Defendant responded yes. Detective Langton testified that while she was speaking to him at the 7-Eleven, he did not appear to have any difficulty understanding what she was telling him.

The Defendant did not have access to a vehicle, so the police took him to his residence located at 4735 DeLeon Street, Unit 123 C, Fort Myers, Florida, approximately one block from the 7-Eleven. He was not being detained nor was he under arrest at that time. He was not handcuffed. The Court finds that the Defendant

voluntarily gave Detective Langton consent by offering to show her the videos on his computer.

Once outside the apartment, Detective Langton testified that she read the Fort Myers Police Department Consent to Search Form to the Defendant, containing eight (8) statements. (Govt. Ex. 1). Detective Langton testified that the Defendant agreed to give the officers consent to enter his apartment, after which he signed the form. (Govt. Ex. 1). She stated on cross examination that the Defendant appeared to understand and did not ask any detailed questions about the statements on the form. After signing the form, the Defendant told Detective Langton that he had underage pornography on his computer. Defendant then led the officers into his apartment and showed them a video depicting a prepubescent girl dancing provocatively in see-through lingerie surrounded by adult men. Based on these observations, Defendant was arrested and transported to the Fort Myers Police Department and law enforcement obtained a search warrant for Defendant's residence and computer, which Detective Langton testified resulted in the seizure of a Samsung laptop and external hard drive.

In this case, based on the totality of the circumstances, the Court finds that the Defendant provided valid voluntary consent to search his apartment both at the 7-Eleven and outside the apartment. A reasonable police officer would have believed that Srisanthia was allowing the officers to enter his home to show them images and videos on his computer. See Rios, 443 F. App'x at 438.

### *The Search Warrant*

As previously stated, this Court finds the consent to search valid, however, even if it were to be determined that the Defendant's consent to search was not valid, the

evidence provided to law enforcement by the Defendant's friends, Holden, and Fraser, provides, in and of itself, sufficient probable cause for a warrant.

The Fourth Amendment requires that there be probable cause to obtain a warrant and that warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." United States v. Martinelli, 454 F.3d 1300, 1307 (11th Cir. 2006). "The affidavit need not allege that any illegal activity occurred at the residence, but should provide a reasonable basis to conclude that the defendant 'might keep evidence of his crimes at home, *i.e.*, a safe yet accessible place.'" United States v. Aguilar, 2013 WL 2256498, *3 (11th Cir. May 22, 2013) (citing United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009) (quotation omitted)). It should "establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." Id. "Evidence that the defendant is in possession of contraband that is of the type that would normally expect to be hidden at their residence will support a search." United States v. Anton, 546 F.3d 1355, 1358 (11th Cir. 2008). "For probable cause to search a residence there must be some nexus between the premises and the alleged criminal activity." United States v. Schulz, 486 F. App'x 838, 841 (11th Cir. 2012) (citing United States v. Bradley, 644 F.3d 1213, 1263 (11th Cir. 2011), cert. denied, —— U.S. – ——, 132 S. Ct. 2375, 182 L. Ed. 2d 1017 (2012)). Affidavits supporting a search warrant are presumed valid. Franks v. Delaware, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684, 57 L. Ed. 2d 667 (1978).

Even where an initial search violates the Fourth Amendment, the fruits of that illegal search can still be admissible under the inevitable discovery exception.

> The elements of the inevitable discovery rule in this circuit were set forth in a former Fifth Circuit case, United States v. Brookins, 614 F.2d 1037 (5th Cir. 1980).[4] To qualify for admissibility, there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct. Id. at 1042 n.2, 1048. See also Roper, 681 F.2d at 1358.

United States v. Satterfield, 743 F.2d 827, 846 (11th Cir. 1984). The active pursuit requirement is satisfied if the police can show that the evidence would have been discovered "by virtue of ordinary investigations of evidence or leads already in their possession." Brookins, 614 F.2d at 1048. "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." Satterfield, 743 F.2d at 845 (citing Nix. v. Williams, 467 U.S. 431, 444, 104 S. Ct. 2501, 2509 (1984)).

Thus, even if certain of the information provided in a search warrant affidavit is found to be tainted, that does not mean that the entire warrant must fail. The Court must look to see even if the Court excludes the information obtained by law enforcement during the initial warrantless and consentless search, probable cause still exists. Under Eleventh Circuit precedent, when a search warrant affidavit is based on information acquired as a result of an illegal entry, the Court must look to whether the

---

[4] The Eleventh Circuit Court of Appeals has adopted the case law of the former Fifth Circuit as its governing body of precedent. This precedent is binding unless and until overruled or modified by this Court en banc. Bonner v. City of Prichard, 661 F.2d 1206, 1209-11 (11th Cir. 1981) (en banc).

other information provided in the affidavit is sufficient to support a probable cause finding. United States v. Chaves, 169 F.3d 687, 692 (11th Cir. 1999). The defendant bears the burden of showing that, "absent those misrepresentations or omissions, probable cause would have been lacking." United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001).

The Court asserts that the evidence obtained in this case was based upon a valid consent as well as a valid search warrant.  However, even if it was determined that what was observed by officers at 4735 DeLeon Street, Unit 123 C, Fort Myers, Florida prior to obtaining the search warrant should be suppressed and therefore taken out of the search warrant, the Court finds that the search warrant was supported by probable cause to believe that Fla. Stat § 827.071(5) had been violated.[5]  Specifically, the supporting affidavit (Govt. Ex. 2) contained information from the sworn and taped statements of Fraser and Holden.  The affidavit states the women reported they had been staying at their friend's apartment located at 4735 DeLeon Street, Unit 123 C, Fort Myers, Florida, because they did not have power at their own residence.  Their friend

---

[5] Pursuant to Fla. Stat. § 827.017(5)

    [I]t is unlawful for any person to knowingly possess, control, or intentionally view a photograph, motion picture, exhibition, show, representation, image, data, computer depiction, or other presentation which, in whole or in part, he or she knows to include any sexual conduct by a child. The possession, control, or intentional viewing of each such photograph, motion picture, exhibition, show, image, data, computer depiction, representation, or presentation is a separate offense. If such photograph, motion picture, exhibition, show, representation, image, data, computer depiction, or other presentation includes sexual conduct by more than one child, then each such child in each such photograph, motion picture, exhibition, show, representation, image, data, computer depiction, or other presentation that is knowingly possessed, controlled, or intentionally viewed is a separate offense. A person who violates this subsection commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

was Chetsada Srisanthia.  He allowed them to stay at his apartment and use his computer while he was at work.  The women indicated that they were on Srisanthia's computer to watch a movie and located what appeared to be several images and videos of children engaged in sexual conduct and called the police.  The women specifically and with particularity described four videos to law enforcement.  The first video depicted two prepubescent girls that appeared to be between the ages of 7-10 running up a hill in their bathing suits, before taking their bathing suits off.  A second video depicted a naked prepubescent boy between 12-13 years of age lying with two naked prepubescent girls on a bed.  A third video depicted a prepubescent girl dancing provocatively in see-through lingerie.  The fourth video depicted a prepubescent girl engaged in sexual conduct as detailed in the affidavit.  (Govt. Ex. 2).  Further, the affidavit included statements made by the Defendant when he was not in custody.

Thus, even excluding what officers observed when they entered Defendant's residence, the totality of the circumstances supports a conclusion that there was "a fair probability of finding contraband or evidence at a particular location" during the October 21, 2012 search pursuant to the valid search warrant.  Martinelli, 454 F.3d at 1307.  The affidavit underlying the warrant established a nexus between the residence and the alleged criminal activity.  Thus, any evidence seized pursuant to the search warrant is not suppressed.

### *Taped Statement at the Police Station*

Miranda v. Arizona requires that before a defendant in custody can be interrogated that the defendant be informed of: (1) the defendant's right to remain silent; (2) that statements can and will be used against them in a court of law; (3) that the

defendant has the right to an attorney during questioning; and (4) that if the defendant cannot afford an attorney one will be appointed. 384 U.S. at 478-79. In this case, it is undisputed that Defendant was under arrest and in custody at the time he gave the taped statement at the police station.

Defendant maintains that there was neither an effective reading nor an effective waiver of his Miranda warnings in his interaction with Detective Langton at the police station. To prove a valid waiver of Miranda rights, the Government must establish: (1) the waiver represented an uncoerced choice and (2) the defendant understood both the nature of the right being waived and the consequences of the waiver. Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986).

A waiver can be express or implied. Express waiver is in an express statement clearly indicating the suspect is willing to answer questions and does not want an attorney, or waiver may be implied from the words and actions of the person being questioned. North Carolina v. Butler, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979). The waiver must be affirmatively made; a waiver cannot be implied simply by answering police questions or failing to invoke a right, after being Mirandized. Edwards v. Arizona, 451 U.S. 477, 481-84, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

There are two distinct dimensions to a knowing and voluntary waiver of the suspect's rights. First, the "relinquishment of the right must have been the product of a free and deliberate choice rather than intimidation, coercion, or deception." United States v. Beale, 921 F.2d 1412, 1435-36 (11th Cir. 1991) (citing Dunkins v. Thigpen, 854 F.2d 394, 398 (11th Cir. 1988)). Second, the "waiver must have been made with

the awareness of both the right[s] being abandoned and the consequences of the decision to abandon [those rights]." Id.

Next, it must be determined whether the Defendant knowingly waived his right to counsel. To be a "valid waiver, the suspect's voluntary decision to speak must be made with full awareness and comprehension of all the information Miranda requires the police to convey." Moran, 475 U.S. at 423-24. Further, if the suspect initially expresses a lack of understanding about his rights, but then gains understanding when his rights are further explained, a waiver would then be knowingly and voluntarily given. United States v. Savatdy, 452 F.3d 974 (8th Cir. 2006). "Only if the totality of the circumstances surrounding the interview reveal an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Id. "In the absence of an express waiver, a waiver of rights can be implied from the actions and words of the person being questioned. For example, if after being advised of his rights an individual responds willingly to questions without requesting an attorney, waiver may be implied." United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir. 1987) (citing United States v. Eirin, 778 F.2d 722, 727-28 (11th Cir. 1985)).

The Eleventh Circuit has recognized that "language barriers may . . . impair an individual's ability to waive his rights in a knowing manner." United States v. Boon San Chong, 829 F.2d at 1574 (citing United States v. Heredia-Fernandez, 756 F.2d 1412, 1415 (9th Cir. 1985)).

In this case, Detective Langton read the Defendant his Miranda rights were from the Fort Myers Police Department form. The tape recording of the interview with

Defendant provides insight into Defendant's understanding of the <u>Miranda</u> warnings. The tape demonstrates confusion on the part of Defendant as to his understanding of what Detective Langton was saying to him. The discussion of his rights was choppy and broken. Detective Langton testified that Defendant did not understand her so she was explaining to him what the rights meant in simpler terms. For example, at the very beginning of the interview, prior to Srisanthia being read his <u>Miranda</u> rights, he advised Detective Langton that he might only understand "like half or something like that" as to what she might say. The detective responded, "I'll try my best to explain it to you." (Govt. Ex. 8, p. 2). After obtaining some basic biographical information, Detective Langton asked what language Defendant spoke, and was advised that he spoke the Thai language and "I talk English a little bit too." (<u>Id.</u> at 7). Once the <u>Miranda</u> reading started, Defendant did not understand the first right to remain silent, along with other basic rights provided to criminal defendants by <u>Miranda</u>.[6] Although there is a signature

---

[6] The exchange was as follows:

Q: Before we ask you any questions you must understand your rights. You have the right to remain silent. Do you understand that?
A: Before you ask me any question?
Q: Uh huh!
A: You, what is it ... must ... just let me see.
Q: I'll have you read it here. Okay!
A: Uh huh!
Q : You have the right to remain silent. Do you understand that?
A: Le man silent? What that mean, silent? Like ahh ...
Q: Meaning you don't have to talk to me at all if you don't want to.
A: Ohh, that mean . . .
Q: It's your choice.
A: But which one better? I talk to you that better, right?
Q: It's your choice, I can't tell you what to do, but do you understand what I'm saying here?
A: Yeah, understand.
* * *
Q: Anything you say can be used against you in court. Do you understand that?
A: Yeah! I heard from… from movie. This one I know.
Q: Okay! You have the right to talk to a lawyer for advice during questioning. Do you understand that?

A: What's that? During ...
Q: During questioning ...
Q: What that mean this one? Like ahh ...
Q : Like while I'm talk to you you have the right to request a lawyer.
A: Like ahh I can call my lawyer, something like that?
Q: If that's what you want you can.
A: Mmm. I don't the ...
Q: Okay!
A: UNINTELLIGIBLE.
Q: You have this right to the advice and presence of a lawyer, even if you cannot afford   to   hire
one, one will be appointed for you, if you wish. Do you understand          that?
A: Yeah! If I don't have ... okay, you can find some for me? Right!
Q: Yes!
A: Okay!
* * *
Q: if you decide you don't wanna talk to me anymore you can stop and that's
okay. I can't force you to talk to me.
A: So I don't ... I don't understand. Okay! That's ... that's why you bring me
over here for talking. So ...
Q: Yes, but that's ... but I ha ... but these are your rights. Okay!
A: Uh huh!
Q: Right now you are detained. Okay!
A: Uh huh! But ...
Q: Okay!
A: one ne ... one detained?
Q: Yes! Do you know what that means?
A: That mean you can hold me for the 24 hour or something like that?
Q: Or lo ... or longer. Technically ...
A: Or longer?
Q: technically right now you are under arrest right now.
A: Under that ...
Q: Under arrest. You are in our custody right now. You are not free to leave.
A: Ohh ...
Q Do you understand that?
A: Now I cannot leave ...
Q: .No!
A: at all?
Q: No, you cannot leave. No!
A: After what?
Q: And that's why I have to read you these rights because you are not free
to leave now. So it is your ... I want to talk to you about what ... what's on
your computer ...
A: Uh huh!
Q: the child pornography.
A: Yeah! Yeah!
Q: Okay!
A: Uh huh!
Q: It is your choice whether or not you want to talk to me. You don't have to.
A: So if I don't have to I go home? That's it?
Q: No! You will not go home tonight.
* * *
Q: Yeah! Okay! This is the waiver; this is pretty much you telling me ... this
says here: I have had... ·

line on the <u>Miranda</u> form, Detective Langton did not have the Defendant sign it.   <u>See</u>

Govt. Ex. 5, Govt. Ex. 8.   At that point, the interview commenced and the Defendant

provided incriminating statements to Detective Langton.

---

A: Uh huh!
Q: read to me the statement of my rights, which is right here.
A: Yeah!
Q: I am willing to answer questions and make a statement. I do not want a
lawyer at -this time. I understand and know what I am doing. No promises or threats have been made against me and no pressure of any kind has been
used against me. Do · you understand that? ·
A: Okay! The first one I understand, but ...
Q: Okay!
A: umm I do not want a lawyer. That mean, okay UNINTELLIGIBLE.
Q: Right now.
A: Right now I don't want it, right.
Q: Okay!
A: I mean. . . okay. And I understand and know that. . . okay, I understand
okay what I'm doing. Okay! What. . . like ahh . . . but I know what I'm doing.
Right?
Q: Yeah! Yeah!
A: Just like I say.
Q: It's simple. Okay!
A: And ahh ... umm what it mean again it's no promise again, what's that
mean?
Q: · No promises means I'm not promising you anything. I'm not saying to
you, "If you talk to me right now I'll buy you a hamburger."
A : Ohh yeah, I understand that one.
* * *
Q: Okay! No promises or threats have been made against me and no
pressure of any kind has been used against me. Do you understand that?
A: I cannot like ahh ... what they call like ahh ... UNINTELLIGIBLE come on,
something like that? No?
Q: What do you mean?
A: Like a ahh ... I can talk to you after this or like something like that. Right!
That mean in here.? Like ahh ...
Q: No! This ... this is ... this is ahh ...
A: UNINTELLIGIBLE you and me, right? This here ...
Q: Yes!
A: Okay!
Q: Exactly! Just between you and me.
* * *
Q: do you still want to talk to me even knowing all this?
A: Yeah! I. .. I want to know something for . . . because I have to plan my life
now. I mean . . . ·I mean so after this, so what ... what happen? So for
example ahh like what happen? Something like that after we talking?
Q: Well . . . well, that's the thing that you . . . but you understand what ...
what ... what I read to you here, right?
A: Uh huh! Understand.
(Govt. Ex. 8).

Based on the totality of the evidence presented to the Court, the Court does not find that Defendant expressly or impliedly waived his <u>Miranda</u> rights during the taped statement. While the Court finds the testimony of Detective Langton credible[7], a review of the evidence shows that Defendant did not understand his <u>Miranda</u> rights, such that he could waive them. It is clear that the Defendant has very limited English skills and in any instances in his life where important matters were discussed with Defendant, he conducted such affairs through his friends interpreting for him. During the taped statement the Defendant repeatedly made clear that he did not understand the Detective's questions nor the meaning of the words being spoken to him. This conclusion is bolstered by the testimony of many of the other witnesses, who attested to the Defendant's difficulties with the English language, including Defendant's friend Sam Phanthavong, Victoria Russell, and Defendant's wife, Sandra Srisanthia. Further, the Court gives great weight to the testimony of attorney Mark Ringsmuth regarding Defendant's inability to understand complex legal matters. Any time he discussed legal concepts with the Defendant – which are what are at issue here – he did so through an interpreter. One of those interpreters was defense witness Sam Phanthavong, also fluent in Thai, who testified that he often helped the Defendant conduct his affairs by explaining things to Defendant. He testified that things often needed to be repeated, rephrased, and that "pretty much every time" Defendant's response does not match what was said to him or asked of him. Defendant often does not understand what is said to him in English and the speaker often needs to rephrase. Further, Phanthavong,

---

[7] In this case, when weighing the credibility of witnesses, the Court does not look at the status of the witness, but rather the Court must weigh the testimonies of all the witnesses, the consistencies or inconsistencies in their testimonies, their demeanor on the stand and the witnesses' interest in the outcome of the hearing. <u>United States v. Ramirez-Chilel</u>, 289 F.3d 744, 749-50 (11th Cir. 2002).

Paul Wakefield, and Victoria Russell, also testified that Defendant often pretended he understood something when he did not, often giving answers which indicated he did not understand what was said to him. While the Government established that Defendant sends text messages to friends in English and converses in English, there was no testimony that Defendant ever conversed in English when discussing important or complicated matters. Thus, the testimony regarding text messages sent by Defendant in English was not particularly compelling to the Court.

It is clear that there was no valid express waiver of Defendant's <u>Miranda</u> rights and the Court does not find implied waiver even though Defendant kept talking to the Detective, because the Court finds that the Defendant did not have sufficient grasp of the English language to understand the rights read to him. Thus, the taped statement is suppressed.

Accordingly, it is now

**ORDERED:**

Defendant's Motion to Suppress (Doc. #21) is **GRANTED in part and DENIED in part**. The Motion is **GRANTED** as to the taped statement provided by Defendant to law enforcement on October 21, 2013, and is otherwise **DENIED**.

**DONE AND ORDERED** at Fort Myers, Florida, this 17th day of, 2013.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record